# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Long M.,

    Plaintiff,

v.

Nancy A. Berryhill, Acting Commissioner
of Social Security

    Defendant.

Case No. 18-cv-862 (ECW)

**ORDER**

This matter is before the Court on Plaintiff Long M.'s ("Plaintiff") Motion for Summary Judgment (Dkt. No. 13) ("Motion") and Defendant Acting Commissioner of Social Security Nancy A. Berryhill's ("Defendant") Cross Motion for Summary Judgment (Dkt. No. 16) ("Cross Motion"). Plaintiff filed this case seeking judicial review of a final decision by Defendant denying his application for disability insurance benefits. He specifically challenges the Administrative Law Judge's ("ALJ") evaluation of the treating opinions of Plaintiff's physician and psychologist and the assessment of his residual functional capacity ("RFC"). For the reasons stated below, Plaintiff's Motion is denied, and Defendant's Cross Motion is granted

## I.    BACKGROUND

Plaintiff filed an application for Disability Insurance Benefits on February 27, 2015, alleging disability beginning February 26, 2014. (R. 188-89.)[1] His application was

---

[1]    The Social Security Administrative Record ("R.") is available at Dkt. No. 12.

denied initially (R. 68) and on reconsideration (R. 95).  Plaintiff requested a hearing before an ALJ, which was held on March 21, 2017 before ALJ Charles Thorbjornsen.  (R. 16.)  The ALJ issued an unfavorable decision on June 1, 2017.  (R. 13.)  Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a), the ALJ first determined that Plaintiff had not engaged in substantial gainful activity since February 26, 2014, the alleged onset date.  (R. 18.)

At step two, the ALJ determined that Plaintiff had the following severe impairment: major depression.  (R. 18.)  The ALJ determined that Plaintiff's other physical impairments were not severe, including: a cerebrovascular accident ("CVA") (stroke); diabetes; hypertension; hyperlipidemia; chronic kidney disease ("CKD"); renal insufficiency; right eye impairment; loss of bladder and bowel control; and pain, numbness, and weakness in the upper and lower extremities.  (R. 19.)  The ALJ noted that each of these impairments were not severe as they had not been shown to more than minimally interfere with Plaintiff's ability to engage in basic work activities.  (R. 19-22.)

At the third step, the ALJ determined that Plaintiff does not have an impairment that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 23.)  The ALJ considered the "paragraph B" criteria as to Plaintiff's mental impairment, namely major depression, but determined that Plaintiff had mild limitations in understanding, remembering, or applying information and in adapting or managing oneself.  (R. 23-24.)  The ALJ determined that Plaintiff had moderate limitations in interacting with others and in concentrating, persisting, or maintaining pace.  (R. 24.)  Because Plaintiff's mental impairment did not cause at least

2

two "marked" limitations or one "extreme" limitation, the ALJ opined that the "paragraph B" criteria were not satisfied. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00. The ALJ also determined that the "paragraph C" criteria were not met. *Id.* ("To satisfy the paragraph C criteria, your mental disorder must be 'serious and persistent'; that is, there must be a medically documented history of the existence of the disorder over a period of at least 2 years, and evidence that satisfies the criteria in both C1 and C2 (see 12.00G).").

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following nonexertional limitations:

> He is limited to performing simple, routine, repetitive tasks. Interaction with supervisors is limited to occasional. Interaction with coworkers and the general public is limited to occasional brief and superficial contact with superficial contact being defined as no lower than an 8 in terms of the fifth digit of the DOT code.

(R. 25.) Based on this RFC, the ALJ determined that Plaintiff is capable of past relevant work as a machine packager, which the vocational expert ("VE") testified a hypothetical individual with the determined RFC could perform. (R. 27-28.)

Alternatively, at step five, the ALJ asked the VE what other jobs a hypothetical person with Plaintiff's RFC, age, education, and work experience could perform in the national economy. (R. 28.) Given all the factors, the VE testified that such an individual could perform jobs such as kitchen helper, laundry worker, hand packager, and cleaner, which exist in significant numbers in the national economy. (R. 28.) Accordingly, the ALJ found Plaintiff not disabled. (R. 29.)

Plaintiff requested review of the decision. (R. 1.) The Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner. (R. 1.) Plaintiff then commenced this action for judicial review. The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties. The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II. LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law. *Nash v. Comm'r, Soc. Sec. Administration*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions." *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)). The Court "considers evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.*

"A disability claimant has the burden to establish her RFC." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). The Eighth Circuit has held that "a

4

'claimant's residual functional capacity is a medical question.'" *Id.* (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'" *Id.* (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)). However, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526–27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)).

"[A] treating physician's opinion is given 'controlling weight' if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (alteration in original) (quoting *Dolph v. Barnhart*, 308 F.3d 876, 878 (8th Cir. 2002)). However, an ALJ may properly "discount or even disregard the opinion of a treating physician where other medical assessments 'are supported by better or more thorough medical evidence' or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000) (quoting *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir. 1997) and citing *Cruze v. Chater*, 85 F.3d 1320, 1324–25 (8th Cir. 1996)). "A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions." *Id.* (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)); *see also Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) ("However, '[a]n ALJ may discount or even disregard the opinion of a treating physician where other medical

5

assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'") (quoting *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)) (alteration in original) (internal quotation omitted). In any case, "the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." *Id.* (quoting 20 C.F.R § 404.1527(d)(2)).

An ALJ should consider several factors, in addition to the objective medical evidence, in assessing a claimant's subjective symptoms, including daily activities; work history; intensity, duration, and frequency of symptoms; any side effects and efficacy of medications; triggering and aggravating factors; and functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *5-7 (S.S.A. Mar. 16, 2016) (listing these factors as relevant in evaluating the intensity, persistence, and limiting effects of a person's symptoms). But the ALJ need not explicitly discuss each factor. *See Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005). "Moreover, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (citation omitted) (highly unlikely that ALJ did not consider and reject physician's opinion when ALJ made specific references to other findings set forth in physician's notes).

### III. DISCUSSION

Plaintiff makes three challenges to the ALJ's determination. First, Plaintiff argues that the ALJ's RFC assessment fails to properly incorporate the mental limitations from

Plaintiff's treating psychologist, Mr. Willie B. Garrett, LP ("Garrett").  Second, Plaintiff argues that the ALJ's RFC assessment fails to properly incorporate the physical limitations from Plaintiff's treating physician, Shihshen (Angela) Yiu, M.D. ("Dr. Yiu"). Third, Plaintiff argues that the ALJ was not appointed in a constitutional manner and therefore lacked authority to decide his case.  The Court addresses each argument in turn.

A.     **The Weight Assigned to the Treating Psychologist's Opinion**

Plaintiff saw Garrett for psychotherapy on a regular basis from August 2014 to at least 2017.[2]  (R. 694-730; *see also* R. 272.)  Garrett completed two questionnaires regarding Plaintiff's mental impairments—one in June 2015 (R. 450-55) and one in February 2017 (R. 729-30).  On June 19, 2015, Garrett filled out a mental impairment questionnaire for Plaintiff and stated that he had seen Plaintiff monthly for one year.  (R. 450.)  Garrett indicated that Plaintiff had Major Depression.  (R. 450.)  Garrett listed a then-current Global Assessment of Functioning ("GAF") score of 49 for Plaintiff with 55 as the highest score in the past year.[3]  (R. 450.)  Garrett described his findings of Plaintiff's severity of mental impairment as "cognitively slow + concrete thinking with

---

[2]     Defendant does not dispute that Garrett is an "acceptable medical source" and Plaintiff's treating source under the regulations.  (*See* Dkt. No. 17 at 8-12.)

[3]     "The GAF scale, which is described in the [Diagnostic and Statistical Manual of Mental Disorders ("DSM")] DSM-III-R (and the DSM-IV), is the scale used in the multiaxial evaluation system endorsed by the American Psychiatric Association.  It does not have a direct correlation to the severity requirements in our mental disorders listings." Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746-01 (Aug. 21, 2000), 2000 WL 1173632; *see also Reed v. Comm'r, Soc. Sec. Admin.*, 750 Fed. Appx. 506, 2019 WL 421739 *1 (8th Cir. Feb. 4, 2019) (per curiam).

diminished memory resulting from the stroke injury." (R. 450.) Garrett checked the following signs and symptoms for Plaintiff: decreased energy; mood disturbances; difficulty thinking or concentrating; persistent disturbances of mood or affect, psychological or behavioral abnormalities associated with a dysfunction of the brain with a specific organic factor judged to be ontologically related to the abnormal mental state and loss of previously acquired functional abilities; perceptual or thinking disturbances; memory impairment—short or, intermediate or long term; sleep disturbances; and loss of intellectual ability of 15 IQ points or more. (R. 451.) As to Plaintiff's mental abilities and aptitudes to do unskilled work or semiskilled work, Garrett checked either "unable to meet competitive standards" or "no useful ability to function" in every category, identifying "stroke cognitive impairments" as the medical/clinical findings that supported his assessment (R. 452-53.) With regard to mental abilities and aptitudes needed to do particular types of jobs, Garrett checked every category with the same two ability levels, except for Plaintiff's ability to "adhere to basic standards of neatness and cleanliness," for which Garrett checked "seriously limited, but not precluded." (R. 453.) Garrett checked that Plaintiff had a low IQ or reduced intellectual functioning, explaining that this was due to "diminished executive abilities from strokes." (R. 453.) Garrett next noted that Plaintiff's depression exacerbates his pain. (R. 453.) For functional limitations, Garrett selected "marked" limitations in "restriction of activities of daily living" and "difficulties in maintaining social functioning" and "extreme" limitations in "difficulties in maintaining concentration, persistence or pace." (R. 454.) Garrett checked that Plaintiff has "[a]n anxiety related disorder and complete inability to function independently

outside the area of one's home." (R. 454.) Garrett also checked that Plaintiff would miss more than four days of work per month and Plaintiff's impairments can be expected to last at least twelve months. (R. 455.)

Garrett filled out a second mental functioning questionnaire for Plaintiff on February 20, 2017, in which he indicated that he had seen Plaintiff twice a month for two years, that Plaintiff had Major Depression, and a then-current GAF score of 40. (R. 729.) Garrett checked boxes for "Marked Limits (Poor Functioning)"—meaning "there is a serious limitation of a substantial loss in the ability to function"—for each and every one of the following mental abilities: (A) understand, remember, and carry out short and simple instructions; (B) remember work-like procedures and make simple work-related decisions; (C) sustain an ordinary routine without special supervision; (D) respond appropriately to changes in a routine work setting; (E) perform at a consistent pace without an unreasonable number and length of rest periods; (F) work in coordination and proximately to others; (G) accept instructions and respond appropriately to criticism from supervisors; (H) get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; (I) interact appropriately with the general public; (J) deal with normal work stress; and (K) maintain regular attendance and be punctual. (R. 729-30.) Garrett also checked boxes for "Extreme" functional limitations in: (A) restriction of activities of daily living; (B) difficulties in maintaining social function; and (C) difficulties in maintaining concentration, persistence or pace. (R. 730.) Garrett checked that Plaintiff would be off task for more than 20% of an 8-hour work day due to

concentration difficulties and would be absent more than 4 days per month as a result of his impairments. (R. 730.)

The ALJ considered Garrett's opinions, but partly disregarded them, stating:

> . . . I have given little weight to [Mr. Garrett's] opinions because Mr. Garrett used check-box forms and provided little explanation of the medical or other evidence relied on in support of his conclusions other than noting a history of strokes (Id.). Mr. Garrett did not begin treating the claimant until several years after his stroke, and the limitations he described were not supported by any neuropsychological testing or other objective evidence. His opinion is overall inconsistent with other substantial evidence of record, including the conservative course of mental health treatment pursued for the claimant.

(R. 27 (citation omitted).) Plaintiff contends that the ALJ should have given Garrett's opinion controlling weight. (Dkt. No. 14 at 18-21.) Plaintiff argues that the ALJ's check-box reason is insufficient and that the ALJ did not give other sufficient reasons for discounting Garrett's opinions. (*Id.* at 19-21.)

Plaintiff is correct that an ALJ cannot discount a treating physician's opinion solely because the opinion is "evaluation by box category." (*Id.* at 19 (citing *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005).) However, the Eighth Circuit has held that a treating physician's opinion is entitled to less weight if it is conclusory. *Chesser v. Berryhill*, 858 F.3d 1161, 1165 (8th Cir. 2017) (citing *Julin v. Colvin*, 826 F.3d 1082, 1089 (8th Cir. 2016)). Moreover, where the opinion is "without explanation or support from clinical findings" and not "not interally consistent with [his] own treatment notations" regarding Plaintiff's cognitive and functional abilities, the opinion has little probative value. *Strongson v. Barnhart*, 361 F.3d 1066, 1071 (8th Cir. 2004).

In his questionnaires, Garrett gave little explanation for the extreme limitations in functioning he found for Plaintiff, stating only they were "from the stroke injury." (R. 450; *see also* R. 453, 729-30.) Garrett noted that Plaintiff's stroke occurred in 2001 (R. 715),[4] but he does not explain why Plaintiff was able to work until 2014 (R. 196)—i.e., for 13 years following the stroke until the alleged onset of disability. Throughout Garrett's treatment notes (R. 694-730), Garrett does note some of the symptoms addressed in his opinion, including major depression, slow and concrete thinking, and poor executive function, but the degree of disability is inconsistent with the extreme limitations in his opinions. In all of the treatment notes, Garrett never proposes any treatment beyond seeing his doctor and returning for additional counseling, which is also inconsistent with the limitations stated in his opinions. (*Id.*) The record of this conservative, routine course of treatment undermines Garrett's opinion. *See Reece v. Colvin*, 834 F.3d 904, 909 (8th Cir. 2016). The ALJ properly noted that Garrett's opinions were largely conclusory.

More important, the extreme limitations in Garrett's opinions are inconsistent with the medical evidence. In his numerous medical progress notes, Plaintiff generally presented as "alert and oriented," as "cooperative and engaged in interview" (R. 401, 408), with "affect appropriate for situation." (R. 401, 408, 411, 415, 419.) His primary care physician reported Plaintiff's symptoms of depression and anxiety as moderate in

---

[4] Garrett's notes indicate a second "documented" stroke and that "doctors suspect a third as well" (R. 715), but there is an absence of evidence of a second "documented" stroke or possible third stroke. (*See, e.g.*, R. 283, 286, 289 (referencing only 2001 stroke); *see also* R. 46 (testifying about "my stroke").)

11

August 2014 through January 2015. (R. 406-07, 409-10, 413-13, 417-18, 425-26.) In January 2015, after starting on Prozac, Plaintiff reported to his primary care physician that he was feeling better (R. 425). *See Brace v. Astrue*, 578 F.3d 882, 886 (8th Cir. 2009) (noting inconsistency in treating physician's opinion when mental impairment is controlled by prescribed medication). For these reasons, the Court finds that Garrett's opinions are inconsistent with the medical evidence. *See Stormo v. Barnhart*, 377 F.3d 801, 805-06 (8th Cir. 2004) (finding that the opinions of treating physicians "are given less weight if they are inconsistent with the record as a whole or if the conclusions consist of vague, conclusory statements unsupported by medically acceptable data").

The ALJ did take into account some of the impairments noted in Garrett's opinions, albeit with less severe limitations than what Garrett opined. (R. 25.) The ALJ included the following nonexertional limitations:

> He is limited to performing simple, routine, repetitive tasks. Interaction with supervisors is limited to occasional. Interaction with coworkers and the general public is limited to occasional brief and superficial contact with superficial contact being defined as no lower than an 8 in terms of the fifth digit of the DOT code.

(*Id.*) The Court concludes that substantial evidence—including some medical evidence—supports the ALJ's RFC determination.

**B.    The Weight Assigned to the Treating Physician's Medical Opinion**

Plaintiff saw Dr. Yiu for primary care on a regular basis at least between June 2013 and September 2016. (R. 376-432, 500-36, 542-70, 657-60; *see also* R. 272.) On June 12, 2015, Dr. Yiu completed a physical RFC questionnaire in which she diagnosed Plaintiff with diabetes, hypertension, CVA, renal insufficiency, and depression. (R. 445.)

Dr. Yiu listed Plaintiff's symptoms as including fatigue, language deficit, communication deficit, depressive mood, and decreased physical strength. (R. 445.) Dr. Yiu listed the following clinical findings and objective signs: difficulty in communication, weakness, and lack of concentration. (R. 445.) Dr. Yiu listed "N/A" for both severity of pain and for treatment side effects. (R. 445.) Dr. Yiu checked that Plaintiff is not a malingerer and that emotional factors—depression and anxiety—contribute to the severity of his symptoms and functional limitations. (R. 446.) Dr. Yiu checked that Plaintiff frequently would experience pain or other symptoms severe enough to interfere with attention and concentration to perform simple work tasks and that Plaintiff would be incapable of even low stress jobs because it would worsen depression. (R. 446.) Dr. Yiu opined that Plaintiff could walk two city blocks without rest, could sit for more than two hours, and could stand for one hour before needing to sit down or walk. (R. 446.) Dr. Yiu checked that Plaintiff could sit for at least six hours and stand/walk for less than two hours in an 8-hour workday. (R. 447.) Dr. Yiu also checked that Plaintiff would need 10-minute periods of walking every 90 minutes during an 8-hour day but would not need a cane or other assistive device. (R. 447.) In addition, Dr. Yiu checked that Plaintiff needs a job that permits shifting position at will and would need hourly 10-minute rests before returning to work. (R. 447.) Dr. Yi checked that Plaintiff could frequently lift less than 10 pounds, occasionally lift 10 pounds, rarely lift 20 pounds, and never lift 50 pounds. (R. 447.) Dr. Yiu checked no limitations or mild limitations in Plaintiff's ability to perform head control activities or twisting, crouching, and climbing activities. (R. 447-48.) Dr. Yiu checked that Plaintiff would be absent more than four days per month as a

result of the impairments. (R. 448.) Lastly, Dr. Yiu noted that "Patient's disability is main[ly] cognitive functions. He has less physical limitations." (R. 448.)

Regarding Dr. Yiu's opinion, the ALJ stated as follows:

> I have given little weight to Dr. Yiu's opinion for several reasons. First, she used a checkbox form and provided little explanation of the medical or other evidence relied on in support of her conclusions, especially with regard to the degree of absenteeism she cited (See Id.). She did state that the claimant's "disability" was mainly cognitive deficits and that he had less physical limitations. This does not explain the rather significant exertional and postural restrictions checked on the form. Dr. Yiu's opinion is overall inconsistent with other substantial evidence of record, including her treatment records discussed earlier in this decision that repeatedly documented largely unremarkable physical examination findings (See e.g. Exhibits 7F, pages 38, 41, 45, 49, 53, 60, 1 lF, pages 28, 48, 57-58, 73, 88, 110, 12F, pages 16, 27, 37, 50, and 16F, page 94). I also note that Dr. Yiu is a general practitioner and not a relevant specialist.

(R. 23.) Although not dispositive of the weight entitled to the opinion, the Court finds that substantial evidence supports the ALJ's decision to discount Dr. Yiu's opinion because it is conclusory, in addition to the reasons that follow. *See Strongson*, 361 F.3d at 1071 (discounting a treating physician's opinion that was "without explanation or support from clinical findings" and not "consistent with his findings of little to moderate limitations").

Plaintiff argues that Dr. Yiu is entitled to controlling weight because it is well supported by the medical evidence, in particular as it relates to Plaintiff's CKD and carpal tunnel syndrome.[5] (Dkt. No. 14 at 23-28.)

---

[5]    Plaintiff does not challenge the ALJ's finding at step two that Plaintiff's CKD and carpal tunnel syndrome are not severe impairments. (R. 18 ("I find all other impairments, alleged and found in the record, are non-severe or not medically determinable as they have been responsive to treatment, cause no more than minimal vocationally relevant

On June 18, 2014, Dr. Sandeep Gupta, Plaintiff's nephrologist, diagnosed Plaintiff with Stage 3 CKD. (R. 300-01.) Dr. Gupta noted that Plaintiff should avoid nephrotoxins such as NSAIDs or aspirin. (R. 300.) Plaintiff underwent medical imaging on June 25, 2015, which determined that Plaintiff's kidneys were within normal limits for size without atrophy and were mildly hyperechoic[6] bilaterally, which was likely secondary to the CKD, had simple bilateral renal cysts, and no hydronephrosis. (R. 302.) On February 8, 2016, Dr. Gupta determined that Plaintiff's CKD "has remained stable" and "is well controlled per patient report." (R. 938.)

Substantial evidence supports the ALJ's finding that Plaintiff's CKD did not interfere with his functioning. (*See* R. 26.) Although Plaintiff had occasional complaints of fatigue at office visits after his CKD diagnosis, Dr. Yiu's notes indicate she thought the fatigue was caused by Plaintiff's depression. (*See, e.g.*, R. 427, 645.) The treatment for Plaintiff's CKD was conservative, involving only avoiding certain nephrotoxins and diet changes (R. 942). *See Reece*, 834 F.3d at 909 (physician's opinion undermined by claimant's conservative, routine course of treatment). In nearly every office visit,

---

limitations, have not lasted or are not expected to result in more than minimal work-related restriction for a continuous period of at least 12 months, are not expected to result in death, and/or have not been properly diagnosed by an acceptable medical source as defined in the regulations (20 CFR 404.1502, 404.1509, 404.1521, 404.1522(a), 416.902, 416.909, 416.921, and 416.922(a)).).) These issues are therefore waived. *See Melder v. Colvin*, 546 F. App'x 605, 606 (8th Cir. 2013) (unpublished) (undeveloped argument is deemed waived).

[6] Hyperechoic: "In ultrasonography, pertaining to material that produces echoes of higher amplitude, or density than the surrounding medium." STEDMAN'S MEDICAL DICTIONARY, 1576 (28th ed. 2006).

15

Plaintiff was noted as physically unremarkable, well-nourished and normally developed, with normal gait. (*E.g.*, R. 623, 634, 644, 764, 784, 794, 824, 862, 883, 896, 921 935, 940.) This evidence is inconsistent with the limitations identified in Dr. Yiu's opinion.

Plaintiff argues that stage 3 CKD necessitates a finding of capable of performing no more than light work and cites a number of opinions from other districts in which courts determined that plaintiffs with stage 3 CKD were limited to light or sedentary work. (Dkt. No. 14 at 24-25.) Although it is true that the opinions cited by Plaintiff establish that someone with stage 3 CKD may be limited to a light RFC, none of the opinions stand for the proposition that every person with stage 3 CKD must be limited to a light RFC. First, the Court notes that Plaintiff did not challenge the ALJ's finding that Plaintiff's CKD is not a severe limitation at step two. Second, "it is not the diagnosis that becomes part of the RFC," instead the RFC "describes a Plaintiff's capabilities and limitations as a result of medical conditions." *See Lappat v. Colvin*, 12-4249-CV-C-ODS, 2013 WL 3288169, at *9 (W.D. Mo. June 28, 2013) (rejecting the argument that a diagnosis of fibromyalgia "means one is automatically disabled"). Thus, the diagnosis of stage 3 CKD alone does not dictate any particular RFC. Instead, the ALJ properly considered the diagnosis and considered all the evidence in formulating the RFC.

Plaintiff next contends that the ALJ failed to account for his carpal tunnel syndrome in the RFC. (Dkt. No. 14 at 26-27.) On March 2, 2016, Masood Ghazali, M.D. examined Plaintiff and found "evidence of a mild left carpal tunnel syndrome (median neuropathy at the wrist), affecting the sensory components." (R. 930.) Plaintiff saw Dr. Yiu on March 20, 2016, who noted that Plaintiff did not want to have surgery

16

and instead wanted to try conservative treatment. (R. 623.) Plaintiff's left wrist was splinted. (R. 624.) Two months after the initial diagnosis, on May 4, 2016, Allan Ingenito, M.D. found no evidence of carpal tunnel syndrome, cervical radiculopathy, lumbar radiculopathy or generalized peripheral. (R. 927.) Substantial evidence supports the ALJ's finding that the carpal tunnel syndrome did not last for a continuous period of 12 months. (R. 22.) On April 22, 2016, Dr. Yiu encouraged Plaintiff to "increase exercise," stating that "[w]alking will help with your feet pain too." (R. 635.) Moreover, Dr. Yiu's opinion did not include any limitations related to reaching, handling, or fingering. (R. 448.)

The ALJ also properly noted the inconsistency between Dr. Yiu's extreme exertional and postural restrictions and her statement that Plaintiff's "disability is main[ly] cognitive functions [and] less physical limitations" (R. 448).[7] (R. 23.) "A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions." *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). The ALJ properly noted that Dr. Yiu is a general practitioner and not a relevant specialist such as a psychologist (R. 23), and thus did not have to give significant weight to Dr. Yiu's genreal assessment of Plaintiff's cognitive functions. *See Hinchey v. Shalala*, 29 F.3d 428, 432

---

[7]  It is also important to note that Plaintiff's past work—in particular his work as a Personal Care Assistant ("PCA") from 2012 to 2014, long after his stroke in 2001—involved frequently lifting 50 pounds or more with the heaviest being 100 pounds or more. (R. 235, 237.) Plaintiff reported that this involved "[l]ifting and carrying [a disabled person] to bed and to get down" as a PCA. (*Id.*)

(8th Cir. 1994) (citing 20 C.F.R. § 416.927(d)(5)) ("We generally give greater weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

## C. Appointments Clause Challenge

Plaintiff lastly argues that remand is appropriate in this case because the ALJ who decided his claim was an inferior officer who was not constitutionally appointed at the time of the decision in this case. (Dkt. No. 14 at 33.) Plaintiff admits that he did not raise this issue before the Social Security Office. (*Id.* at 33 n.2.)

In support of this argument, Plaintiff relies on the decision by the United States Supreme Court in *Lucia v. SEC*, 138 S. Ct. 2044 (2018). In *Lucia,* the Supreme Court held that executive agency ALJs are "officers of the United States" and are therefore governed the to the Appointments Clause of the United States Constitution, Article II, section 2, clause 2. *See Lucia*, 138 S. Ct. at 2055. The Appointments Clause provides that the President:

> Shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the [S]upreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Constitution, Art. II, § 2, cl. 2 (emphasis added).

In *Lucia*, the plaintiff timely contested the validity of the ALJ's appointment by raising the challenge before the Securities and Exchange Commission, as well as in the Court of Appeals and the Supreme Court. 138 S. Ct. at 2055 (finding that the plaintiff

18

"made just such a timely challenge: He contested the validity of [the ALJ's] appointment before the Commission, and continued pressing that claim in the Court of Appeals and this Court."). The Eighth Circuit has determined that a constitutional challenge under the Appointments Clause is non-jurisdictional, and, therefore, a party may forfeit an Appointments Clause claim by failing to raise it at the administrative level. *See N.L.R.B. v. RELCO Locomotives, Inc.*, 734 F.3d 764, 798 (8th Cir. 2013) (holding that a party waived the Appointments Clause challenge by failing to raise the issue before the agency).

Plaintiff cites to *Sims v. Apfel*, 530 U.S. 103, 112 (2000), for the proposition that his failure to raise the Appointments Clause challenge at the administrative level is not fatal to his argument because there is no issue exhaustion requirement in Social Security appeals. In *Sims*, the Supreme Court held: "Claimants who exhaust administrative remedies need not also exhaust issues in a request for review by the Appeals Council in order to preserve judicial review of those issues." *Id.* However, it is important to note that the Supreme Court in *Sims* did not reach the issue of whether a claimant needed to raise an issue sometime during the administrative review, noting that "[w]hether a claimant must exhaust issues before the ALJ is not before us." *Id.* at 107. While Plaintiff may not have to raise the Appointments Clause challenge to the Commissioner via the Appeals Council, *Lucia* made it clear that, with regard to Appointments Clause challenges, only "one who makes a timely challenge" to the administrative body is entitled to relief. 138 S. Ct. at 2055 (citation omitted); *see also Stearns v. Berryhill*, No. C17-2031-LTS, 2018 WL 4380984, at *5 (N.D. Iowa Sept. 14, 2018). The Eighth

Circuit has concluded that a Social Security disability claimant's failure to raise a disability claim to an ALJ "waived [the claim] from being raised on appeal." *Anderson v. Barnhart*, 344 F.3d 809, 814 (8th Cir. 2003) ("Anderson never alleged any limitation in function as a result of his obesity in his application for benefits or during the hearing. Accordingly, this claim was waived from being raised on appeal."). As such, given that Plaintiff failed to raise the Appointments Clause challenge at any point during the administrative process, he has waived this claim.

## IV. ORDER

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1. Plaintiff Long M.'s Motion for Summary Judgment (Dkt. No. 13) is **DENIED**;

2. Defendant Acting Commissioner of Social Security Nancy A. Berryhill's Cross Motion for Summary Judgment (Dkt. No. 16) is **GRANTED**; and

3. This case is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: May 17, 2019
*s/Elizabeth Cowan Wright*
ELIZABETH COWAN WRIGHT
United States Magistrate Judge